IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs January 24, 2019

## STATE OF TENNESSEE v. SHARLES JOHNSON

**Appeal from the Criminal Court for Knox County**
**No. 105144     Bobby R. McGee, Judge**

_____

## No. E2018-00810-CCA-R3-CD

_____

The defendant, Sharles Johnson, appeals his Knox County Criminal Court jury conviction of theft. He challenges the sufficiency of the evidence as to the element of intent. We affirm the jury verdicts but remand the case for the entry of corrected judgments reflecting that the alternative counts of theft are merged.

**Tenn. R. App. P. 3; Judgment of the Criminal Court Affirmed and Remanded**

JAMES CURWOOD WITT, JR., J., delivered the opinion of the court, in which D. KELLY THOMAS, JR., and ROBERT H. MONTGOMERY, JR., JJ., joined.

J. Liddell Kirk, Knoxville, TN (on appeal); and Kate Holtkamp and Christy Murray, Assistant District Public Defenders (at trial), for the appellant, Sharles Johnson.

Herbert H. Slatery III, Attorney General and Reporter; Renee W. Turner, Assistant Attorney General; Charme P. Allen, District Attorney General; and Nathaniel Ogle, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

The Knox County Grand Jury charged the defendant with alternative counts of theft of property valued at $500 or less. *See* T.C.A. § 39-14-103; -105 (2014).

At the November 2016 trial, Walmart loss-prevention associate Brandon Shope testified that, on November 11, 2014, while "on the sales floor walking around and . . . looking for suspicious activity," he observed the defendant "moving at a little bit faster rate of speed" inside Walmart. Mr. Shope explained that such behavior is typical in shoplifting cases, so he began following the defendant "for the rest of [the defendant's] duration of his time in the store." Mr. Shope followed the defendant to the automotive department, where the defendant "selected a car battery and put it in his cart." According

to Mr. Shope, "[c]ar batteries are a high-theft item," so, when he saw that the defendant did not pay for the battery in the automotive department, he notified his supervisor, Andrew Weise, that the defendant had "selected a car battery and ha[d] left the automotive department."

Mr. Shope testified that he followed the defendant to the electronics department, where the defendant placed Skylander toys in his cart. The defendant then went to the customer service department at the front of the store where he asked for a price match on the Skylander toys. Mr. Shope stated that the defendant never removed the car battery from his cart. After paying for the Skylander toys at the customer service counter, the defendant headed "towards the general merchandise side of the store," and Mr. Shope continued to follow him "in case he did go for the door, we were going to apprehend him for shoplifting." Instead of leaving the store, the defendant stopped inside the Smart Style Salon ("the salon") near the exit doors. After leaving the salon, the defendant "walk[ed] all the way back across the front of the store to the grocery doors," where he stopped and "spen[t] a short amount of time there talking to the door greeter at the grocery side doors." Next, Mr. Shope saw the defendant "push[] the cart out through the grocery doors, past all points of sale and into the vestibule," where Mr. Shope and Mr. Weise apprehended him as "he was literally exiting the second set of doors" leading "outside to the sidewalk." The defendant was escorted to the loss-prevention office, where he stated that he knew he was being followed and that "he was joking around or that it was some sort of game to him" and that "he just kind of wanted to see if we would be apprehending him for what he was doing." Mr. Shope stated that the defendant did not seem to take the situation "as serious as he probably should have."

Mr. Shope testified that he was very familiar with the store's surveillance procedures and that he used the video surveillance equipment daily. He stated that, in this case, he made copies of the video surveillance footage showing the defendant's movements around the store. He explained that the video surveillance cameras in the store do not track movement but rather "kind of give an overview look of an area," and they cover "nowhere near 100" percent of the store leaving "very large chunks of the store that . . . are not covered by cameras." The jury viewed video footage taken from the store's surveillance cameras showing the defendant walking through the store, being apprehended at the store's exit, and sitting in the loss-prevention office. Mr. Shope stated that there was no footage of the defendant selecting the car battery and placing it in his cart because there was no camera on the automotive section.

During cross-examination, Mr. Shope agreed that not every person who walks quickly through the store is a shoplifter, but he testified that he would follow any person that he observed walking quickly stating, "We follow dozens of people a day and

-2-

most of them pay and most of them have no idea they were ever being followed." Mr. Shope noted that, although Mr. Weise was also watching the defendant in the store, Mr. Weise went to the loss-prevention office "[a]t some point." Mr. Shope acknowledged that the defendant did not attempt to conceal the car battery in his cart but stated that it was Walmart's policy to apprehend anyone who took unpurchased merchandise into the vestibule.

Walmart Customer Service Manager Pam Strasner testified that on November 11, 2014, she was called to the customer service desk to assist another associate with a price match for the defendant. She processed the price match request and asked the defendant if he would like to pay for the car battery as well, and the defendant replied that "he had paid for it in automotive." Ms. Strasner contacted the automotive department to confirm whether the defendant had in fact paid for the car battery and was told that he did not pay for it there. Ms. Strasner again asked the defendant about the battery, and the defendant insisted that "he had paid for it in automotive." Ms. Strasner described what happened next: The defendant "left the Customer Service area and headed towards the general merchandise doors" but "quickly went into" the salon. After leaving the salon, the defendant "quickly came past" Ms. Strasner, "headed to the grocery side door," and went to the produce department. Ms. Strasner stated that she never saw the defendant pay for the battery.

Walmart Asset Protection Manager Andrew Weise testified that, on the day of the offense, Mr. Shope informed him that the defendant had selected a car battery without paying for it in the automotive department; after learning this information, Mr. Weise began following the defendant around the store. Mr. Weise explained that most customers paid for car batteries in the automotive department because the batteries were under a warranty which required entering the serial number of the battery into the warranty system. He testified that he commonly follows those individuals on "a mission walk," which he described as "someone who is walking very quickly, not paying attention, really, to what's going on around them and they look like they're on a mission." He also pays close attention to items that are high-theft items, including car batteries.

While following the defendant throughout the store, Mr. Weise saw him "select[] a couple of toys" from the electronics department. The defendant "proceeded to the service desk," which, Mr. Weise explained, can be indicative of "someone possibly going to do a fraudulent return." He notified a customer service manager to "kind of keep an eye on it." Mr. Weise was informed that the defendant paid for the toys at the customer service desk but did not pay for the battery. Mr. Weise watched the defendant leave customer service with the battery still in his cart and proceed to the "general

merchandise side of the store." The defendant entered the salon "for a couple of minutes" and then "proceed[ed] to the other side of the store, to the grocery exit." After talking with a door greeter "for a few minutes," the defendant "exit[ed] through the vestibule and out the set of doors with the battery." When the defendant began heading to the grocery side of the store, Mr. Weise "quickly went outside, came back around the grocery side of the store, went into our asset protection office, which . . . is in the grocery vestibule [area]." Mr. Weise peered through the peephole in the office door, "watching for [the defendant] to pass all points of sale and go out the doors." When the defendant began to proceed through the last set of doors, Mr. Weise exited the office and apprehended the defendant. Mr. Weise believed that the defendant intended to exit the store with the car battery because the defendant did not hesitate to exit and did not turn around at any point.

After apprehending the defendant and escorting him to the loss-prevention office, Mr. Weise notified a customer service manager to determine the value of the car battery. Mr. Weise noted that, while in the loss-prevention office, the defendant "was very calm, pleasant, [and] joking." Mr. Weise stated that the defendant "mentioned that he knew we were watching him, and he just kind of did it as a joke to see if we would still stop him after him seeing us watch him." The defendant never said that he intended to purchase the battery.

On cross-examination, Mr. Weise testified that it was Walmart's policy to apprehend anyone that took unpurchased merchandise "past all points of sale, and then out through the [Electronic Article Surveillance ("EAS")] system," which Mr. Weise described as the electronic security devices at the doorways of the store. Mr. Weise explained that, although it was the store's policy to apprehend someone who took unpurchased merchandise through the EAS system, "we like to give them that extra chance" and wait until a person begins to exit the final set of doors "before we apprehend them."

The defendant testified that he shopped at the Turkey Creek Walmart "once or twice a week" and had "buil[t] a relationship with" some of the employees. On November 11, 2014, the defendant went to Walmart to purchase items for upcoming family birthdays. He needed to pick his children up at 3:00 p.m. that day, so he knew that he "had to be in and out" of the store quickly. He testified that, when he first arrived at the store, he went to the toy section and then to the automotive section where he measured a battery for a "sand rail" that he had built. He stated that he "need[ed] to find out about the cold crank" of the battery to determine whether it was "the right size." He took the battery from the automotive section to the front of the store to make his inquiries because he "knew who was working" in the automotive section and knew that "they

-4-

didn't know what the heck they were doing." The defendant noticed that he was being followed around the store, which he thought was odd stating, "unless they know you or they trying to talk to you, . . . they must think you're up to something or whatever." He proceeded to the customer service counter at the front of the store with the car battery and some Skylander toys in his cart. He asked an employee to price match some items, and that employee called Ms. Strasner for assistance. Ms. Strasner asked the defendant about the battery, and he told her "I got that from back there." Ms. Strasner then "whispered to the lady. And then I saw her take out a sheet of paper and she wrote something down on this piece of paper. She folded it up and handed it to the lady. And I said, get out of here." The defendant testified that he never told Ms. Strasner that he paid for the battery in the automotive department; instead, he told her "I got it from back there." He noted that Ms. Strasner was behaving oddly and that "[h]er face was real red" which was "out of character from the relationship that [he] had with her."

The defendant asked who was the manager on duty, but when an employee identified the manager, the defendant said, "[W]ell, I won't be dealing with that situation," and left the customer service area. He walked toward the "front door" with the battery, when he again noticed two people he believed were following him. He entered the salon for "a few minutes" where he inquired about a haircut "as a joke because [he has] something called alopecia." He explained that he "was putting that joke in the middle of that situation, messing with them." He then walked to the other side of the store where he talked with the door greeter, Jimmy.[1] He again inquired about a manager, whom Jimmy identified, but the defendant believed that a manager was not available. The defendant then "sort of turned [his] back to him" and "look[ed] to see where these guys [we]re that [we]re following [him] around the store." At that point, he knew that he was being followed around the store, and he felt in "a shock" at the situation.

The defendant testified that he decided "[t]o keep it up, to confront those two people that were following [him] around the store," but, before he could confront them, "they pop[ped] up" and apprehended him. The defendant was taken to the loss-prevention office where he had a conversation with Mr. Weise while Mr. Shope was "just doing something on the computer." He contended that he never told Mr. Weise nor Mr. Shope that he thought the incident was a game. He stated that he did not think there was a problem with carrying unpurchased merchandise into the vestibule past the EAS machines because the store often places merchandise for sale in that area. He testified that, when he took the car battery into the store's vestibule, he was not stealing it and that he had no plans to take it from Walmart's premises.

---

[1]     Jimmy's last name is not provided in the record.

On cross-examination, the defendant testified that he did not intend to exit the store with the battery "[w]ithout being confronted" by store employees. He stated that he knew that "[s]ooner or later, because of the interaction and what they were doing, . . . we would have some type of confrontation." It was never his intention, he said, "to keep this battery from Walmart"; rather, he intended only to confront the employees about the situation. He explained that he did not turn around when walking out of the store because he had seen Mr. Weise exit the store when the defendant was in the salon, and he suspected that Mr. Weise "had went around somewhere to try to meet me or to do something different." The defendant asserted that the shopping cart with the battery in it "never made it past the threshold" of the exit doors and "there was still time to also have actually left that cart right there." He testified that it was his intent to leave the cart behind "[s]ooner or later."

When asked why he did not seek assistance with the battery from an employee in another department if he did not trust the employee in the automotive department, the defendant intimated that if the loss-prevention employees had not aggravated the situation and he had "been allowed to go on [his] way, . . . the cart could have been taken back with the battery to ask those gentlemen the question that [he] had about the battery." He acknowledged that he did not pay for the battery.

Based on this evidence, the jury convicted the defendant as charged, and the trial court sentenced him to an effective sentence of 11 months and 29 days suspended to supervised probation. The trial court noted that after the defendant satisfied his court costs, he could petition for his sentence to be downgraded to unsupervised probation.

The defendant filed a timely but unsuccessful motion for new trial followed by this timely appeal. In this appeal, the defendant challenges the sufficiency of the evidence as to the element of intent. The State argues that the evidence is sufficient to support the jury's verdicts.

We review the defendant's claim of insufficient evidence mindful that our standard of review is whether, after considering the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Tenn. R. App. P. 13(e); *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *State v. Winters*, 137 S.W.3d 641, 654 (Tenn. Crim. App. 2003). This standard applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of direct and circumstantial evidence. *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011).

-6-

When examining the sufficiency of the evidence, this court should neither re-weigh the evidence nor substitute its inferences for those drawn by the trier of fact. *Id.* Questions concerning the credibility of the witnesses, the weight and value of the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact. *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978). Significantly, this court must afford the State the strongest legitimate view of the evidence contained in the record as well as all reasonable and legitimate inferences which may be drawn from the evidence. *Id.*

As relevant to this case, "[a] person commits theft of property if, with intent to deprive the owner of property, the person knowingly obtains or exercises control over the property without the owner's effective consent." T.C.A. § 39-14-103(a). "Theft of property or services is . . . [a] Class A misdemeanor if the value of the property or services obtained is five hundred dollars ($500) or less . . . ." *Id.* § 39-1-105(a)(1) (2014).

Here, the proof adduced at trial established that the defendant selected a car battery from Walmart's merchandise and placed it in his shopping cart. The defendant admitted that he did not pay for the battery, and security camera footage showed him exiting the store with the battery before he was stopped by loss-prevention associates. The defendant contends that because he did not conceal the battery from store employees and because he knew that store employees were watching his actions with the battery, the State failed to carry its burden in proving that he intended to deprive Walmart of the battery. However, the jury heard and rejected the defendant's testimony that he did not intend to deprive Walmart of the battery, as was their prerogative. Questions of witness credibility and all factual issues are resolved by the jury. *See State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978). Moreover, the jury was free to infer the defendant's intent by circumstantial evidence. *See Poag v. State*, 567 S.W.2d 775, 778 (Tenn. Crim. App. 1978) ("An accused's knowledge and intent may be proved by circumstantial evidence.") (citing *Bennet v. State*, 530 S.W.2d 788, 791 (Tenn. Crim. App. 1975); *see also Hall v. State*, 490 S.W.2d 495, 496 (Tenn. 1973)). The video footage showing the defendant's leaving the store with the unpurchased battery is sufficient to support the jury's determination that the defendant intended to deprive Walmart of the battery.

The defendant was convicted of alternative counts of theft of property valued at $500 or less for the single act of taking the battery from Walmart. Because the judgments in the record do not indicate that the trial court merged the convictions, we remand the case for the entry of corrected judgment forms indicating in the Special Conditions portion that the jury verdicts are merged into a single judgment of conviction.

-7-

Accordingly, the convictions are affirmed but the case is remanded for the entry of corrected judgment forms.

_____
JAMES CURWOOD WITT, JR., JUDGE